IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Donnie Joe Jones, a/k/a<br>Donnie Jones,<br><br>        Plaintiff,<br><br>v.<br><br>David M. McCall, John B. Pate, John<br>Tomarchio, Carol E. Mitchell-Hamilton,<br>Virginia A. Dean, Robert M. Stevenson, III,<br>Leroy Cartledge, Joseph Alewine,<br>Edward Stahl, Franklin Richardson, Jr.<br>and John B. Mcree,<br><br>        Defendants. | )  CIVIL ACTION NO. 9:14-2033-DCN-BM<br>)<br>)<br>)<br>)<br>)<br>)  **REPORT AND RECOMMENDATION**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983. Plaintiff, an inmate with the South Carolina Department of Corrections (SCDC), alleges violations of his constitutional rights by the named Defendants.

The Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on March 10, 2015. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on March 11, 2015, advising Plaintiff of the importance of a dispositive motion and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case. After receiving an extension of time to reply, Plaintiff filed his own motion for summary judgment on June



17, 2015.  Defendants have filed both a reply and a response to Plaintiff's filing.

These motions are now before the Court for disposition.[1]

### Background and Evidence

Plaintiff alleges in his verified Complaint,[2] as amended,[3] that he is an inmate at the McCormick Correctional Institution (MCI), part of the South Carolina Department of Corrections. Plaintiff alleges that all of the named Defendants have been deliberately indifferent to his serious medical needs.  Specifically, Plaintiff alleges that he has "multi-level degenerative disc disease and Grade II spondylolisthesis with severe bilateral foraminal stenosis bilaterally and central stenosis as well".  Plaintiff alleges that the Defendants "haven't treated Plaintiff's injury reasonably", other than with "minor medication".

Plaintiff alleges that on October 23, 2012 he sent a request to medical about his back pain and to find out why he was no longer being treated for his back problem.  Plaintiff alleges that on November 13, 2012, he was seen at sick call about a back issue, asked for pain medication as well as to "see a doctor", but that the "nurse seemed plaintiff only wanted to get high on drugs".  Plaintiff alleges that he was thereafter seen by "Dr. Drago" on January 23, 2013,  that he told Dr. Drago that

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C.  The parties have filed motions for summary judgment.  As these motions are dispositive, this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the factual allegations contained therein are based on personal knowledge.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

[3]Plaintiff filed an "Amendment" to his Complaint on June 16, 2014, reiterating that he is suing the Defendants in both their official and individual capacities, and requesting 5.5 million dollars in monetary damages.  See Court Docket No. 13.



his pain was getting worse, that he was having numbness in his legs, and that Tylenol and Ibuprofen were not helping him. Plaintiff seems to indicate that he wanted Tylox or Percocet instead. However, Plaintiff alleges that on January 31, 2013 he was told by Dr. Drago that "per Doctor Tomarchio", Plaintiff was to receive conservative treatment prior to seeing a neurosurgeon. Plaintiff alleges that he was then given Prednisone, which was "non-helpful".

Plaintiff alleges that on June 12, 2013, he was seen at the doctor's clinic about an injury to his hand,[4] but that he also told the attendants about his history of a back injury and asked for pain medication. Plaintiff appears to allege that he was advised that he was restricted from "narcotic use", although he also alleges that his "Neurotin" was increased. Plaintiff alleges he was seen again at sick call on July 30, 2013 for another reason, but also continued to complain about his "severe back and leg pain".

Plaintiff alleges that on October 21, 2013 he went to sick call complaining that his back was getting worse and asking for pain medication, which he also did again on January 6, 2014. Plaintiff alleges that he was told that the Defendant Dr. McRee would "probably take Plaintiff off all meds if Plaintiff kept asking for pain meds . . . .". Plaintiff alleges that when he was seen in sick call again on January 13, 2014, he was told to take Ibuprofen, even though Plaintiff alleges that this medication "didn't help at all". Plaintiff alleges that on March 12, 2014 he asked why he was not being seen by the neurosurgeon and was not getting adequate pain medication for his condition, but that he was only given Mobic. On April 29, 2014, he was seen by "Nurse Brewer again", who said

---

[4]Plaintiff filed a separate lawsuit alleging that prison officials were deliberately indifferent to his serious medical needs with respect to this hand injury. That lawsuit was dismissed at summary judgment. See Jones v. McCall, Civil Action No. 9:14-338 (D.S.C.).



she would speak to Dr. McRee, but that when he next saw her she told him that Dr. McRee had said Plaintiff's issues "should have been addressed before now and he is not going to address this at MCI". Finally, on May 7, 2014, Plaintiff wrote to Dr. McRee explaining his disorder and that he was in severe pain, but that he was told that "long term narcotic pain medication is not a choice".

Plaintiff alleges that his "severe pain" is getting worse, and that "all defendants know this". Plaintiff alleges that he has been sent to an "outside specialist", who suggested proper treatment and medications, but that the Defendants "chose to ignore" this advice. Plaintiff alleges that he did at one time "accidentally" refuse a neurosurgery appointment on November 29, 2011 because he "thought it was a family court run", following which he was "punished" by the Defendants "cutting his medication in dosage". Plaintiff alleges that the Defendant Franklin Richardson has a history of not "pulling" Plaintiff for medical, even though he complained to Richardson about his "severe pain and his leg going numb at times and . . . not being able to walk."

Plaintiff also alleges that he was issued "medical shoes" due to concrete being hard on his back, but that these shoes were later "lost in a court run & couldn't be found". Plaintiff alleges that when he asked for replacement shoes, medical told him that they had no record of giving him shoes, even though he had a shoe "prescription". Plaintiff alleges that when he went to sick call in May 2014 about getting his shoes replaced, he was told by Dr. McRee that he "can't have them again", even though a neurosurgeon had said Plaintiff needed them. Plaintiff also alleges that he complained about his Neurotin getting "cut in half" because he was apparently receiving a "vitamin" pain pill, which Plaintiff alleges "didn't help at all". Plaintiff also alleges that the Defendant Carol Mitchell-Hamilton refused him further treatment and had "refused to respond" to his medical requests "since 3-29-13".



Plaintiff alleges that he spoke to the Defendant McCall about his illness on February 13, 2013, and also wrote several Requests to Staff to McCall while he was at that the Lee Correctional Institution. Plaintiff also alleges that the Defendant Nurse Virginia Dean has been aware of his problems since December 23, 2013, but that "she didn't attempt to reasonably respond . . . .". Plaintiff alleges he wrote to the Defendant John Pate about his failure to obtain reasonable treatment for his "serious medical condition", and also spoke to Pate in person, but that Pate told him that he "didn't like narcotics so plaintiff would have to deal with the pain". Plaintiff also alleges that the Defendants Tomarchio, Cartledge and Alewine have refused to help him, despite his repeated requests. Plaintiff further alleges that he has written the Defendant Dr. Edward Stahl "several times" since August 23, 2012, and has never received any response. Plaintiff alleges that he believes the Defendants are refusing to properly treat him because he is a "mental health patient".

Plaintiff seeks monetary damages for his complaints. Plaintiff has attached to his Complaint a "Declaration" in which he attests that everything he says in this Complaint is true, and has also attached 113 pages of exhibits to his Complaint, which include copies of various medical consults, imaging results, medication records (many of which date to as far back as 2009), and Request to Staff Member forms. See generally, Plaintiff's Verified Complaint, as amended, with attached Exhibits.

In support of summary judgment in this case, the Defendant Carol Mitchell-Hamilton has submitted an affidavit wherein she attests that she is a nurse practitioner with the SCDC, that she was assigned to the Broad River Correctional Institution during the relevant time period, and that she has seen the Plaintiff on several occasions. Nurse Mitchell-Hamilton attests that, from her review of Plaintiff's medical records along her personal recollections of the treatments she provided



to the Plaintiff, in her opinion Plaintiff has been provided with appropriate medical care. Nurse Mitchell-Hamilton attests that she first saw the Plaintiff on April 4, 2013 in relation to an injury to his left hand, and that she thereafter saw the Plaintiff on several additional occasions, primarily for the injury to his hand, but on one occasion in relation to complaints concerning his back. That was on June 12, 2013, when she saw the Plaintiff for complaints of lower back and right leg pain. Nurse Mitchell-Hamilton attests that on examination Plaintiff had a steady gait, good range of motion, and that she could find no objective evidence of pain during her examination. Nurse Mitchell-Hamilton attests that Plaintiff requested an increase in his dosage of Neurotin, and that despite the fact that she could find no objective evidence of pain, she agreed to increase Plaintiff's prescription based on his subjective statements. Nurse Mitchell-Hamilton attests that since Neurotin is not in the SCDC Drug Formulary, she submitted the request to increase Plaintiff's dosage for approval, and that this request was approved by Dr. Tomarchio, the Medical Director.

Nurse Mitchell-Hamilton attests that Plaintiff was seen by other medical personnel on July 30, 2013, complaining about numbness in his fingers and also right leg numbness, and that she reviewed this encounter record and ordered that Plaintiff be scheduled to be seen by her for a followup evaluation. She then saw the Plaintiff on August 22, 2013, at which time Plaintiff complained only about his hand, and did not reference any complaints concerning his back. Nurse Mitchell-Hamilton attests that if Plaintiff had complained about issues with his back, she would have noted this in his medical records. Nurse Mitchell-Hamilton attests that she saw the Plaintiff one additional occasion while he was at the Broad River Correctional Institution, on December 18, 2013, for a possible spider bite. She attests that Plaintiff made no complaints relating to his back at that time. Nurse Mitchell-Hamilton attests that Plaintiff was thereafter transferred to the McCormick



Correctional Institution on December 23, 2013, and that she has had no further involvement with his care and treatment since that time.

Nurse Mitchell-Hamilton attests that, based on her review of Plaintiff's medical records and her examinations of the Plaintiff, in her opinion Plaintiff has been provided appropriate medical care in accordance with generally accepted medical practices. See generally, Mitchell-Hamilton Affidavit.

The Defendant Franklin Richardson has also submitted an affidavit wherein he attests that he is a Lieutenant at the Lee Correctional Institution (LCI), where he works in the Special Management Unit (SMU). Richardson attests that in this capacity he speaks with inmates about concerns or issues they may have, and that although he and the Plaintiff likely spoke on one or more occasions when Plaintiff was housed there, he does not have any specific recollection as to the nature of those conversations. Richardson attests that he specifically does not recall ever speaking with the Plaintiff concerning medical care for his back. In any event, Richardson attests that if an inmate has an obvious medical emergency, he would take immediate action; otherwise, a Plaintiff complaining about a medical issue is instructed to sign up for sick call. Richardson attests that at no time did he take any action to deny Plaintiff proper medical care, that he does not have any advanced medical training, does not overrule the medical judgments of the trained medical personnel concerning the medical treatment provided to inmates, and that he relies on the expertise of the trained medical personnel to provide medical care to inmates.

Richardson attests that sick call is conducted four days per week in the SMU (Monday, Tuesday, Wednesday, and Thursday), and that inmates will also be seen for emergency conditions on Friday, Saturday and Sunday. Richardson attests that the procedure is generally that



inmates will sign up for sick call, the sick call request will be provided to the medical department, and medical personnel will then provide a list of inmates who need to be seen. Those inmates are then seen in the medical area in the SMU. Richardson attests that in order for inmates to be seen by medical personnel there have to be two officers present to stay with the inmate while medical personnel are present, and that there are situations where, due to staff availability, inmates may not be seen if medical personnel determine that they can wait to be seen the following day. However, Richardson attests that if an inmate needs to be seen by medical personnel, they will be seen. In addition, medical personnel provide medications to the inmates in the SMU three times a day, and if an inmate needs to be seen the nurse handing out medications can inform medical personnel that the inmate needs to be seen immediately.

Finally, Richardson attests that Plaintiff is no longer housed at LCI, and that while he has no first hand knowledge concerning the medical care provided to the Plaintiff, it is his understanding that Plaintiff was seen on multiple occasions and received appropriate medical care while at LCI. See generally, Richardson Affidavit.

The Defendant Glenn Alewine[5] has submitted an affidavit wherein he attests that he is a physician assigned to the specialty clinic at the Kirkland Correctional Institution, that he is a General Practitioner licensed to practice medicine in South Carolina, and has been practicing medicine for thirty-three years. Dr. Alewine attests that, since 2008, he has worked exclusively with HIV patients in the SCDC. Dr. Alewine attests that, as Plaintiff is not an HIV patient, he would not have treated him, that he has not personally examined the Plaintiff, and that he has no personal

---

[5]Although this Defendant is listed as "Joseph" Alewine in the caption of the Complaint, he signed his affidavit "J. Glenn Alewine".



recollection of the Plaintiff.  Dr. Alewine attests that the only involvement he had with Plaintiff's care was on April 18, 2013, when Plaintiff was seen by an orthopedist who recommended that Plaintiff be provided Percocet for pain.  Dr. Alewine attests that Nurse Practitioner Hamilton reviewed the recommendations from the orthopedist, but that since she could not write the prescription because this medication cannot be prescribed by Nurse Practitioners in the SCDC, the encounter was routed to the "M.D.".  Dr. Alewine attests that he then reviewed the encounter and wrote a prescription for this medication.

Dr. Alewine further attests that he does not recall receiving any Request to Staff from the Plaintiff, but that if he did, he would have either sent it back to him informing Plaintiff that he was not the appropriate individual to write concerning his care, or he would have forwarded the request directly to the appropriate individual.  Dr. Alewine attests that he had previously been the Medical Director for the SCDC (but had not been in that position since 2008), so that if Plaintiff had directed a Request to Staff to the "Medical Director" or to him as the Medical Director, it would not have been sent to him, but would have instead been sent to the Medical Director at that time.  Dr. Alewine concludes his affidavit by attesting that at all times in his dealings with the Plaintiff, he has acted in accordance with generally accepted medical practices, and that in his opinion Plaintiff has been provided proper medical care.  See generally, Alewine Affidavits.

The Defendant Dr. John McRee has submitted an affidavit wherein he attests that he is the physician assigned to MCI, and that as a licensed General Practitioner he has been practicing medicine for thirty-five years.  Dr. McRee attests that his duties as a physician with the SCDC include diagnosing, treating, and providing medications for inmates.  He also has administrative responsibilities as the Acting Medical Director for the SCDC.  Dr. McRee attests that he has



reviewed Plaintiff's medical records, and has also seen the Plaintiff on at least one occasion, and that based on his review of Plaintiff's medical records along with his personal recollections of the treatment provided to the Plaintiff, and in his opinion Plaintiff has been provided appropriate medical care.

Dr. McRee attests that Plaintiff came to MCI in late 2013 before being subsequently transferred to the Lieber Correctional Institution in late July 2014. Dr. McRee attests that Plaintiff was first seen by medical personnel at MCI on December 23, 2013, and was first seen in relation to complaints concerning his back on January 6, 2014, when he was seen by nursing personnel requesting a back brace for back pain. Plaintiff advised the nurses that he was on Neurotin for back pain and that he thought he was supposed to see a neurosurgeon. Dr. McRee attests that the nurse examined the Plaintiff and left the entry open for him to review Plaintiff's request for a back brace. Dr. McRee attests that he thereafter approved for Plaintiff to be issued an abdominal binder.

Dr. McRee attests that Plaintiff was next seen by medical personnel on January 13, 2014, by Nurse Dean, at which time he was complaining that his lower back problems were getting progressively worse and that he was having right leg numbness at times. Dean noted in her medical record that Plaintiff had ambulated to the sick call area unassisted and had no noticeable limping or difficulty walking, that Plaintiff was able to sit and stand without distress, and had good range of motion. Dean reviewed Plaintiff's encounters from the prior two years and saw that he had been seen by an orthopedist and neurologist recently for injuries related to his hand, as well as that he [Dr. McRee] had ordered Plaintiff an abdominal binder, which had not been provided yet because one was not available in Plaintiff's size, but would be provided when available. Dr. McRee further attests that Plaintiff's blood pressure was noted to be 113/64 and his pulse rate was 80, findings



inconsistent with an individual who was in severe pain.

Dr. McRee attests that Plaintiff was next seen for issues concerning his back on March 12, 2014, at which time he stated he was on Neurontin for nerve pain in his back and legs, but was requesting additional medication for pain in his knee. Dr. McRee attests that he reviewed this encounter and approved Plaintiff to have a knee sleeve if this was approved by security, while also prescribing Mobic for pain. Dr. McRee attests that Plaintiff again complained that he was in constant pain with his knee, but that his vital signs did not support this contention, as his blood pressure was 108/68 and his pulse was 70. When Plaintiff was thereafter seen by medical personnel on April 24, 2014, Plaintiff's complaint was of pain upon urination. Dr. McRee attests that he prescribed Plaintiff some Septra, an antibiotic.

Dr. McRee attests that Plaintiff was seen again in relation to complaints of back pain on April 29, 2014, at which time Plaintiff brought copies of prior diagnostic tests with him to the clinic. These materials included an MRI report from January 2, 2009, which noted that Plaintiff had moderate bilateral L5-S1 forminal stenosis secondary to spondylolysis and spondylolisthesis, and mild degenerative changes at L4-5 and L3-4 with midline posterior annular tears with moderate diffuse bulging. Dr. McRee attests that Plaintiff stated that he wanted to go back to the neurosurgeon so that he could have surgery done, but that he reviewed the materials Plaintiff had and determined that this was a congenital defect and that, if surgery was to be done, it should have been done prior to Plaintiff reaching puberty. Dr. McRee further attests that, in his opinion, back surgery would not be appropriate for this condition, as back surgery is generally a last resort because there are inherent risks and back surgery often is not successful in alleviating pain. Dr. McRee also noted that Plaintiff's blood pressure was 120/80 and his pulse was 80, which were again not consistent with



Plaintiff's continued complaints of severe pain.

Dr. McRee attests that Plaintiff was seen again by medical personnel on May 7, 2014 in relation to complaints of back pain, at which time Plaintiff again brought copies of past test results and stated that he was supposed to have seen a neurosurgeon on January 31, 2013, but did not because he was transferred. Dr. McRee attests that the diagnostic tests Plaintiff had were approximately five years old, and were therefore too old to be used for treatment at that time. Dr. McRee further attests that the nurse noted that Plaintiff was able to complete range of motion exercises of his back and had no abnormalities in the muscles upon palpation of his back. Dr. McRee attests that Plaintiff also requested to be provided with special shoes for his back, but that he reviewed the encounter notes and determined that Plaintiff did not qualify for special shoes and would not qualify even if he was not housed in the SMU.[6]

Dr. McRee attests that Plaintiff was seen again by nurses on May 19, 2014, requesting that he be provided Percocet for back pain. Dr. McRee thereafter saw the Plaintiff in relation to this complaint on May 22, 2014, where Plaintiff presented as a 31 year old male with a long history of back problems. Plaintiff told Dr. McRee that he had first had back trouble in high school while playing football and discovered that he had a lower back deformity. On examination Plaintiff had no muscle spasms and had full range of motion with some effort, and Dr. McRee informed him that he would not prescribe narcotics for him for a problem that he would have for the rest of his life, although he did prescribe Plaintiff Naprosyn for thirty days for pain. Plaintiff's blood pressure at that time was 122/76 and his pulse was 78, which Dr. McRee again attests was not consistent with

---

[6]There are, however, some entries in the exhibits provided to the Court showing where Plaintiff had been provided some converse tennis shoes in 2009.



extreme pain. Even so, Dr. McRee attests that as there were no current diagnostic tests, he ordered that Plaintiff be sent for a CT of the lumbar spine to be followed by an appointment with Dr. Grabowski, an orthopedic surgeon who specializes in back issued. Dr. McRee attests that Plaintiff thereafter had a myelogram and CT scan on June 13, 2014. The myelogram showed that Plaintiff had bilateral L5 spondylolysis with mild Grade II spondylolisthesis and a mild bulge of the posterior disc margins at L3-4 and L4-5, while the CT scan showed L5-S1 anterior spondylolisthesis, bilateral L5-S1 neuroforaminal stenosis considered moderate to severe, and mild degenerative disc changes with slight loss in height and a mild bulge at L4-5 without herniating, spinal canal, or foraminal stenosis. Dr. McRee attests that, even though Plaintiff had previously been seen by neurosurgery with a similar study with no surgery having been recommended, and despite the fact that there were no significant changes from Plaintiff's prior studies from 2009, he ordered Plaintiff to be seen by Dr. Grabowski, to get his opinion concerning Plaintiff's long term care.

Plaintiff was thereafter seen by nursing personnel on June 24, 2014 requesting to see a doctor as well as more pain medication. Dr. McRee attests that he reviewed this encounter, again noted that Plaintiff was not a candidate for long term narcotics, and that he had an upcoming appointment with Dr. Grabowski to evaluate his back problems. Dr. McRee attests that Plaintiff subsequently went on a hunger strike and was seen for issues relating to this and by mental health personnel, but that he did not have any additional involvement with the Plaintiff during the remainder of his time at MCI. Dr. McRee attests that, from a review of Plaintiff's medical records, it appears that Plaintiff was transferred to the Leiber Correctional Institution on July 23, 2014, following which he did not have any additional direct involvement with Plaintiff's care other than in his capacity as acting Medical Director.



Dr. McRee attests that, as acting Medical Director, he is required to approve if an inmate is prescribed medications which are not on the SCDC Drug Formulary, for inmates to be seen by specialists, for inmates to have diagnostic testing such as an MRI, or for inmates to have a surgical procedure. Dr. McRee attests that, in this capacity, on October 10, 2014 he approved a request for a surgical consult for the Plaintiff and for Plaintiff to be sent for an MRI. Dr. McRee attests that an MRI of Plaintiff's lumbar spine was thereafter performed on November 3, 2014, which showed minimal changes from Plaintiff's MRI completed on January 2, 2009.[7] Dr. McRee attests that, after reviewing this report, the Nurse Practitioner instructed that the results be sent to the specialty clinic and that surgery be scheduled per Dr. Grabowski's request. Dr. McRee attests that there is a notation that the MRI results had been sent to the specialty clinic on November 7, 2014, and that "[a]t this point[8] we are waiting to hear from Dr. Grabowski as to how he wishes to proceed". Dr. McRee attests that while Dr. Grabowski had previously recommended surgery, he needed to state specifically the procedure he intended to perform, and that he [Dr. McRee] had requested medical personnel at Lieber to follow up with Dr. Grabowski's office as to how he intended to proceed.

Otherwise, Dr. McRee attests that Plaintiff was seen by medical personnel on November 12, 2014. Plaintiff told the medical providers that he had fallen down the stairs, but he had numerous abrasions, cuts, and puncture wounds and medical personnel suspected that Plaintiff had actually been in an altercation with another inmate, although Plaintiff denied this. He was

---

[7]Medical notations in the evidence from 2009 reflect that Plaintiff's test results showed that he "may need surgery" and that Plaintiff would be "consider[ed]" for surgery if "injection not helpful".

[8]Dr. McRee's affidavit is dated January 22, 2015.



treated for his wounds.  Dr. McRee attests that Plaintiff continued to be seen for wounds related to this incident and had some issues with a possible infection, but that when Plaintiff was last seen in relation to these injuries on November 30, 2014, his wounds were determined to be completely healed.  Plaintiff was also seen by mental health personnel on December 2, 2014 complaining that he had been stabbed twenty days earlier.  Plaintiff was complaining at that time that no one would take action against the individual who had stabbed him, although Plaintiff refused to identify the individual.

Dr. McRee attests that no request has been made to him for surgery to be performed at the time he executed his affidavit, and that he remains uncertain if surgery will improve Plaintiff's condition.  Dr. McRee opines that surgery could potentially make Plaintiff's condition worse, but that he will defer to Dr. Grabowski, and that if Dr. Grabowski recommends that surgery go forward, then he will approve the surgery.  Dr. McRee does note, however, that Plaintiff could not have gone forward with the surgery until his injuries from the November 12, 2014 incident were completely healed, and that Plaintiff had also gone on several hunger strikes in December 2014, during which time he would have also not been sent or scheduled for surgery.

Dr. McRee attests that based on his review of Plaintiff's medical records and his examinations of the Plaintiff, in his opinion Plaintiff has been provided appropriate medical care in accordance with generally accepted medical practices.  See generally, McRee Affidavit.

The Defendant John Pate has submitted an affidavit wherein he attests that he is the Warden of the Allendale Correctional Institution, and that based on his review of Plaintiff's records, Plaintiff has never been incarcerated at ACI.  Pate further attests that he does not recall receiving any Request to Staff from the Plaintiff, but that even if he had, he would have returned it to the Plaintiff



because Plaintiff is not housed at Allendale. Pate attests that he has no knowledge concerning the Plaintiff or his medical care, and has had no involvement of any kind in Plaintiff's medical care. <u>See</u> <u>generally</u>, <u>Pate Affidavit</u>.

The Defendant John Tomarchio has submitted an affidavit wherein he attests that he is a Resident Physician in the Department of Family and Preventive Medicine at the University of South Carolina School of Medicine and Palmetto Health, but was formerly employed by the SCDC in September 2010, including as the Acting Medical Director for the SCDC beginning May 2012. Dr. Tomarchio attests that he left employment with the SCDC on October 30, 2013. Dr. Tomarchio attests that he is a general practitioner licensed to practice medicine in South Carolina, and that as Medical Director he had broad supervisory responsibilities and oversaw all physicians and mid-level providers in the SCDC. However, he maintained his office in Columbia, and did not have an office in any correctional institution. Dr. Tomarchio attests that, with respect to any dealings he had with the Plaintiff, he acted in accordance with generally accepted medical practices, and that in his opinion Plaintiff has been provided proper medical care. <u>See</u> <u>generally</u>, <u>Tomarchio Affidavit</u>.

The Defendant Leroy Cartledge has submitted an Affidavit wherein he attests that he is the Warden at MCI, where he estimates he receives an average of thirty or more inmate Request to Staff per day on a variety of issues. Cartledge attests that while it is possible that he received a Request to Staff from the Plaintiff, he has no specific recollection or record of receiving a request from Plaintiff concerning the medical care he was being provided. Cartledge also attests that he has no advanced medical training, that he relies on the expertise of trained medical personnel to provide medical care to inmates, and that he does not overrule the medical judgments of trained medical personnel concerning the medical treatment provided to inmates. Cartledge attests that if he did

- 16 -



receive a Request to Staff from an inmate concerning their medical care, he would generally refer that inmate to the medical department.  Cartledge attests that he has no first hand knowledge concerning the medical care provided to the Plaintiff, although it is his understanding that Plaintiff was seen on multiple occasions while at MCI and received appropriate medical care.  See generally, Cartledge Affidavit.

The Defendant Michael McCall has submitted an affidavit wherein he attests that he is currently the Deputy Director of Operations of SCDC, but that prior to assuming this position he was the Warden at the Lee Correctional Institution.  McCall attests that while he was the warden at LCI, he would receive an average of forty to fifty inmate Request to Staff per day on a variety of issues.  He would also generally walk through different areas of the prison on a daily basis, speaking with up to thirty or more inmates a day, and that while it was possible he spoke with the Plaintiff, he has no specific recollection of speaking with the Plaintiff concerning the medical care he was being provided.  McCall does attest, however, that if an inmate presented to him with an obvious medical emergency, he would have taken immediate action; otherwise, he would instruct the inmate to sign up for sick call.  Further, if he received a Request to Staff from an inmate or spoke with an inmate concerning their medical care, he would generally refer the inmate to the medical department.  McCall attests that it is his understanding that Plaintiff was seen by medical on multiple occasions while at LCI, and received appropriate medical care.  See generally, McCall Affidavit.

The Defendant Robert Stevenson has submitted an affidavit wherein he attests that he  is the Warden at the Broad River Correctional Institution, where he receives an average of forty or more inmate Request to Staff per day.  Stevenson attests that he has no recollection of receiving any Request to Staff from the Plaintiff, and in fact has no recollection of the Plaintiff, including no



recollection of ever instructing officers to confiscate Plaintiff's back brace.  Stevenson attests that

it is possible that he received a Request to Staff from the Plaintiff, although again he does not recall

it.  Stevenson further attests that inmates in the SMU, where Plaintiff was housed, are limited in the

items they can have in their possession, including specifically being prohibited from having any type

of brace that has metal or hard plastic, as these can be made into weapons or keys.  Stevenson attests

that the SMU is the highest security level and most secure area of the prison, and is used to house

inmates who present a high security risk and at a high security level.  Stevenson attests that inmates

are generally placed in the SMU because of disciplinary problems or assaultive or violent behavior,

and that in fact Plaintiff has multiple disciplinary offenses and, according to his records, convictions

for inciting/creating a disturbance, possession of a weapon, possession of security equipment, and

threatening to inflict harm on an employee, among others.  Stevenson attests that items such as a

brace, that has a metal or hard plastic, create a security concern not only because they can be used

by the person to whom they are issued as a weapon, but could also be provided to another inmate,

who could use the item as a weapon.  Stevenson attests that, unfortunately, even in the SMU inmates

are able to find ways to transfer items to other inmates, and that a brace could therefore be used to

create a dangerous weapon that could be used to harm SCDC staff or possibly another inmate, or

could be used to fabricate a key.  Hence, although Stevenson attests that he does not recall Plaintiff

or ordering that his brace be confiscated, if this did occur Plaintiff could have contacted medical

personnel concerning this issue, and that if he had been informed by medical personnel that Plaintiff

needed to have the brace, he would have attempted to work with medical to find an acceptable

alternative.  See generally, Stevenson Affidavit.

       The Defendant Virginia Dean has submitted an affidavit wherein she attests that she



has been a registered nurse for approximately nineteen years, and that she works for the SCDC and is assigned to the McCormick Correctional Institution, where her duties include examining, treating and providing medications for inmates. Dean attests that she has reviewed Plaintiff's records, and that she saw the Plaintiff on one occasion, January 13, 2014. Dean attests that although she does not recall the Plaintiff, his medical records reflect that he complained at that time about his back problems getting worse and his right leg going numb. Plaintiff also stated that he was supposed to see a doctor about having surgery on his back. Dean attests that Plaintiff ambulated to the sick call area without assistance, with no noticeable limping or difficulty, that he was able to sit and stand without rest and had good range of motion in his knees, and was taking Neurotin. Dean attests that a review of Plaintiff's encounters from the prior two years reflected that he had been seen by an orthopedist and neurologist recently for injuries related to his hand, and that he had also seen Dr. McRee, who had ordered an abdominal binder. Dean attests that these records reflected that there was not a binder available in Plaintiff's size at that time, but that one was to be provided when available. Dean attests that Plaintiff was in no apparent distress, and that there did not appear to be any change in his condition since his recent assessment.

Dean attests that, as a nurse, she does not have the authority to prescribe medications, send an inmate for diagnostic tests such as a CT or MRI, send an inmate to be seen by a specialist, or schedule surgery. Dean attests that Plaintiff was not in any apparent distress when she saw him, and that no additional treatment was required at that time. Further, although she does not recall receiving any Request to Staff from the Plaintiff, if she had, they would have been treated as a Request for the Plaintiff to be seen in sick call. Dean attests that based on her review of Plaintiff's medical records, in her opinion Plaintiff was provided appropriate medical care while at MCI, and



that at all times in her dealings with the Plaintiff, she acted in accordance with generally accepted medical practices and that Plaintiff has been provided proper medical care. See generally, Dean Affidavit.

The Defendant Kathy Hill has submitted an affidavit wherein she attests that she is an Administrative Specialist II in the Health Information Resources Department at the SCDC. Hill has attached to her affidavit a copy of Plaintiff's medical records setting forth the care and treatment of the Plaintiff from January 1, 2009 to the present. See generally, Hill Affidavit, with attached Exhibit 1 (Plaintiff's Medical Records totaling 548 pages).

As attachments to his response in opposition to the Defendants' motion and his cross motion for summary judgment, Plaintiff has submitted 112 pages of exhibits, most of which are the same medical records and Request to Staff forms previously submitted as attachments to his Complaint. Plaintiff has also attached copies of the affidavits from McRee, Mitchell-Hamilton, and Tamarchio that have been submitted by the Defendants. See generally, Plaintiff's Exhibits.

## Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991). Once the moving party makes this showing, however, the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial. Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). Further, while the Federal Court is charged with liberally construing



a complaint filed by a <u>pro se</u> litigant to allow the development of a potentially meritorious case, <u>see</u> <u>Cruz v. Beto</u>, 405 U.S. 319 (1972); <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. <u>Weller v. Dep't of Social Services</u>, 901 F.2d 387 (4th Cir. 1990).  Here, after careful review and consideration of the arguments and evidence submitted to this Court, the undersigned finds for the reasons set forth hereinbelow that the Defendants are entitled to summary judgment in this case.

### I.

While Plaintiff seeks monetary damages against the Defendants in both their official and individual capacities, none of the defendants named in this lawsuit are subject to monetary damages in their official capacities.  <u>Green v. Williams</u>, No. 13-1019, 2014 WL 6666638 at * 1 (D.S.C. Nov. 24, 2014) [Employees of the South Carolina Department of Corrections are entitled to Eleventh Amendment immunity in their official capacities from damages].  Therefore, Plaintiff's request for damages against the Defendants in their official capacities must be dismissed.

### II.

While public officials such as the Defendants are subject to monetary damages under § 1983 in their individual capacities, in order for any of them to be liable, Plaintiff must have evidence to show that the named Defendant actually engaged in conduct which denied Plaintiff his constitutional rights.  <u>See</u> <u>Barren v. Harrington</u>, 152 F.3d 1193, 1194 (9th Cir. 1999) ["Liability . . . must be based on the personal involvement of the Defendant"], <u>cert</u> <u>denied</u>, 522 U.S. 1154 (1999); <u>Wilson v. Cooper</u>, 922 F.Supp. 1286, 1293 (N.D.Ill. 1996); <u>see also</u> <u>Horton v. Marovich</u>, 925



F.Supp. 540 (N.D.Ill. 1996) ["Thus, a plaintiff suing a government official in his individual capacity and therefore seeking to hold the official personally liable must show that the official personally caused or played a role in causing the deprivation of a federal rights"].

Here, it is readily apparent that the Defendants McCall, Pate, Cartledge, and Stevenson have been included as Defendants in this action solely by virtue of their supervisory positions at various prison institutions. Other than possibly reviewing Request to Staff forms or having had Plaintiff make a complaint to them about his medical care, none of these officials are alleged to have had anything to do with Plaintiff's medical care and treatment, and the doctrines of vicarious liability and respondeat superior are not applicable in § 1983 cases. See Vinnedge v. Gibbs, 550 F.2d 926, 927-929 & nn. 1-2 (4th Cir. 1977). Rather, as supervisory officials, McCall, Pate, Stevenson and Cartledge may be held liable in a § 1983 action only for an official policy or custom for which they are responsible and which resulted in illegal action. See generally, Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978); Wetherington v. Phillips, 380 F.Supp. 426, 428-429 (E.D.N.C. 1974), aff'd, 526 F.2d 591 (4th Cir. 1975); Joyner v. Abbott Laboratories, 674 F.Supp. 185, 191 (E.D.N.C. 1987); Stubb v. Hunter, 806 F.Supp. 81, 82-83 (D.S.C. 1992); See Slakan v. Porter, 737 F.2d 368, 375-376 (4th Cir. 1984), cert. denied, Reed v. Slakan, 470 U.S. 1035 (1985); Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), cert. denied, 115 S.Ct. 67 (1994); Fisher v. Washington Metro Area Transit Authority, 690 F.2d 1133, 1142-1143 (4th Cir. 1982) (citing Hall v. Tawney, 621 F.2d 607 (4th Cir. 1980)), abrogated on other grounds, County of Riverside, 500 U.S. 44 (1991). No such policy or custom is alleged here. Instead, Plaintiff's complaint is that the medical personnel involved in his case did not make (in his opinion) the proper medical decisions about what should be done about his back problems, and that (at most) these supervisory personnel



refused to do anything about these medical decisions or order contrary treatment.

As for the Defendant Richardson (a correctional officer at LCI), there is again no evidence that Richardson had any involvement in Plaintiff's medical care and treatment, other than Plaintiff possibly complaining to him about the medical care he was receiving.  None of these individuals are physicians, and they cannot be held liable for any medical decisions made by any of the prison medical personnel just because they are employees of the prison.  Rather, all of these officials were entitled to rely on the judgment and decisions made by the medical professionals who saw the Plaintiff with respect to Plaintiff's medical care. Cf. Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) [officials entitled to rely on judgment of medical personnel]; Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) [officials entitled to rely on expertise of medical personnel].

Hence, even if the Court were to find otherwise that the claims made against the named medical Defendants are sufficient to survive summary judgment, McCall, Pate, Stevenson, Cartledge and Richardson are entitled to dismissal as party Defendants.

## II.

With respect to the remaining Defendants, in order to proceed with a claim for denial of medical care as a constitutional violation, Plaintiff must have presented evidence sufficient to create a genuine issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Farmer v. Brennen, 511 U.S. 825, 837 (1994); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Belcher v. Oliver, 898 F.2d 32 (4th Cir. 1990).  Plaintiff has failed to submit any such evidence.  Rather, the evidence before this Court, including the various affidavits from Plaintiff's medical professionals, Plaintiff's medical records,



as well as Plaintiff's own statements in his filings and exhibits, shows that Plaintiff received continuous and ongoing treatment for his medical complaints.

Plaintiff was regularly seen by nurses and nurse practitioners, he was seen by (and his file was reviewed by) several physicians, and he has even been approved for outside surgery if recommended by the orthopedic specialist.  He has had x-rays, MRIs and CT scans performed, he has received antibiotics, pain prescriptions, as well as other medications, and while Plaintiff obviously disagrees with the course of his medical treatment for his back complaints, and believes the medical professionals as well as prison officials did not care about or were indifferent to this condition, none of the voluminous  medical evidence provided to this Court shows that any named Defendant, or any other medical personnel, were deliberately indifferent to Plaintiff's serious medical needs.  <u>Levy v. State of Ill. Dept. of Corrections</u>, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting <u>Farmer</u>, 511 U.S. at 837; <u>House v. New Castle County</u>, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim].

Plaintiff's complaint is quite simply that he believes he should have been seen by a specialist and/or perhaps had surgery performed earlier in the process than was determined by the medical personnel who saw him.  Even with respect to this claim, however, Plaintiff has failed to show that any delays in treatment due to (in Plaintiff's opinion) his tardy referral to Dr. Grabowski, or otherwise, resulted in any constitutional violation.  <u>Hill v. Dekalb Regional Youth Detention Center</u>, 40 F.3d 1176, 1188-1189 (11th Cir. 1994)["An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to



establish the detrimental effect of delay in medical treatment to succeed"], <u>overruled in part by</u> <u>Hope</u> <u>v. Pelzer</u>, 536 U.S. 730, 739 n. 9 (2002).  To the contrary, the evidence reflects that the medical professionals involved in Plaintiff's case evaluated Plaintiff's condition and decided the type of care and treatment that was warranted based on their professional experience and judgment, and Plaintiff's mere lay disagreement with the opinions or diagnoses of these medical professionals, without any contrary *medical* evidence to show that any medical professional violated the requisite standard of care for his complaints, is not sufficient to maintain a §1983 deliberate indifference lawsuit.  <u>See</u> <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985)[Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim absent exceptional circumstances]; <u>Scheckells v. Goord</u>, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing <u>O'Connor</u> <u>v. Pierson</u>, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]).

In sum, Plaintiff has presented no evidence, by way of medical records or findings or testimony from a medical professional, to show that the medical care and treatment he received was contrary to any established medical duty of care, and he cannot simply allege in a conclusory fashion that he did not receive constitutionally adequate medical care or attention, otherwise provide no supporting evidence, and expect to survive summary judgment, particularly when the Defendants have submitted voluminous medical documents and testimonial evidence showing that Plaintiff was regularly seen and evaluated by medical personnel for his complaints and which refute Plaintiff's claims.  <u>Green v. Senkowski</u>, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]; <u>Morgan v. Church's Fried Chicken</u>, 829 F.2d 10, 12 (6th Cir. 1987)



["Even though <u>pro se</u> litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; <u>Levy</u>, 1997 WL 112833 at * 2 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"].

Plaintiff may, of course, pursue a claim in state court if he believes that the medical care provided to him constitutes malpractice.  However, that is not the issue before this Court. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."].  The evidence before the Court is insufficient to raise a genuine issue of fact as to whether any named Defendant was deliberately indifferent to Plaintiff's serious medical needs, the standard for a constitutional claim, and Plaintiff's federal § 1983 medical claim should therefore be dismissed.  See <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; <u>Baker v. McClellan</u>, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care]; <u>Estelle</u>, 429 U.S. at 106 ["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."].

<u>**Conclusion**</u>

Based on the foregoing, it is recommended that the Plaintiff's motion for summary judgment be **denied**, that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed**.



The parties are referred to the Notice Page attached hereto.



_____
Bristow Marchant
United States Magistrate Judge

July 13, 2015
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4ᵗʰ Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

– 28 –

